**WEGMAN et al. v. HULSE et al.**

District Court, W. D. New York. March 6, 1928.

1. **Banks and banking** ⬥287(2)—Examination by national bank examiner in conjunction with appraisal committee of clearing house association held "due examination" of national bank's affairs in appointing receiver (12 USCA § 191).

Under 12 USCA § 191, providing that, when Comptroller is satisfied of insolvency of national banking association, he may after due examination of its affairs appoint receiver, examination made by national bank examiner in conjunction with appraisal committee of clearing house association *held* to constitute "due examination" of its affairs.

[Ed. Note.—For other definitions, see Words and Phrases, Due Examination.]

2. **Banks and banking** ⬥287(2)—Comptroller had authority to appoint receiver for national banking association, after causing examination of its affairs and being satisfied of its insolvency.

Appointment of receiver for national banking association by Comptroller of Currency *held* within his authority, where he caused examination of affairs of bank to be made and had become satisfied of its insolvency.

3. **Banks and banking** ⬥285—Comptroller held to have acted in good faith in entering settlement agreement with directors of insolvent national bank (12 USCA § 192).

Comptroller of Currency *held* justified in entering settlement agreement with directors of insolvent national bank, under 12 USCA § 192, as against contention that he acted in bad faith and in collusion with directors of another bank.

In Equity. Suit by William J. Wegman and another, suing for the National Bank of Commerce of Rochester, and for themselves and all other stockholders thereof, against Jonas J. Hulse, as receiver of the National Bank of Commerce of Rochester, and others. Decree in accordance with opinion.

See, also, 13 F.(2d) 206.

James D. Harris, of Fairport, N. Y., for plaintiffs.

Carnahan, Pierce & Block, of Rochester, N. Y. (George Carnahan and Wilton A. Block, both of Rochester, N. Y., of counsel), for defendants McIntosh and Hulse.

Wile, Oviatt & Gilman, of Rochester, N. Y. (Percival D. Oviatt, of Rochester, N. Y., of counsel), for defendants Deininger, Hickey, Lowenthal, Riley, and Kelly.

Sutherland & Dwyer, of Rochester, N. Y. (Arthur E. Sutherland, of Rochester, N. Y., of counsel), for defendant Dunn.

Hubbell, Taylor, Goodwin & Moser, of Rochester, N. Y. (Clarence P. Moser, of Rochester, N. Y., of counsel), for defendant Lennox.

John Van Voorhis' Sons, of Rochester, N. Y. (Eugene Van Voorhis, of Rochester, N. Y., of counsel), for defendant Mabbett.

Harris, Beach & Matson, of Rochester, N. Y. (Willis Matson, of Rochester, N. Y., of counsel), for defendants Farley and Warner.

William W. Armstrong, of Rochester, N. Y., for defendant Ingle.

Remington, Remington & Keating, of Rochester, N. Y. (Kenneth Keating, of Rochester, N. Y., of counsel), for defendant Argetsinger.

Warren, Shuster & Case, of Rochester, N. Y. (Stephen Warren, of Rochester, N. Y., of counsel), for defendants Davenport and Barhite.

Werner, Harris & Buck, of Rochester, N. Y. (George Harris, of Rochester, N. Y., of counsel), for defendant Douglas.

McLean, Duffy & Kaelber, of Rochester, N. Y. (Carl Kaelber, of Rochester, N. Y., of counsel), for defendant Kaelber.

ADLER, District Judge. The National Bank of Commerce of Rochester suspended business on May 17, 1924. Prior to this time negotiations had been under way with a view to bringing about the consolidation of the National Bank of Commerce and the Traders' National Bank under the charter of one of them. This plan of consolidation was abandoned. In pursuance of what seems to have been an alternative plan, the National Bank of Rochester was organized. On May 19, 1924, a contract was entered into between the National Bank of Commerce and the newly organized bank, the National Bank of Rochester. This agreement provided briefly as follows:

The old bank transferred to the new bank all of its good property and assets, to be taken over by the new bank at their face value. The old bank executed to the new bank a note of face value equal to the difference between the total liabilities of the old bank and the assets conveyed as above; the stockholders to be liable for this indebtedness. The residue of the assets were conveyed to the new bank in trust to be applied on the note, and if the proceeds from such trust properties shall be sufficient to pay the note, the remaining trust properties, if any, to be reconveyed to the old bank. The new bank agreed to assume to pay: (a) Liabilities of old bank to its depositors; (b) liabilities of old bank on Schedule A, except with respect to capital stock; (c) liabilities of old bank in contracts for new bank building.

The situation then was that the National

Bank of Commerce had entirely divested itself of its assets, and under the statutes it was necessary that it take one of two courses, either to go into voluntary liquidation by a vote of its stockholders, or go into a receivership. It appears that steps were taken to bring about a stockholders' meeting, with a view to voting on voluntary liquidation. The Deputy Comptroller of the Currency came to Rochester about this time, and learned that action for voluntary liquidation on the part of the National Bank of Commerce would probably not be taken by the shareholders at the meeting which was called for June 25, 1924. On June 21, 1924, the Comptroller of the Currency appointed a receiver for the National Bank of Commerce. Different receivers of the National Bank of Commerce were appointed during the year 1924, due to death and resignations, and on September 8, 1925, Jonas J. Hulse was appointed receiver, and he is still serving.

Thereafter the receiver and the Comptroller of the Currency took up the matter of the liability of the directors of the National Bank of Commerce for mismanagement. The Perley-Morse Company, public accountants, had been employed to make an investigation of the directors' liability, and their report was received by the Comptroller in July, 1925. This report showed a possible liability of the directors in excess of $3,000,000 on November 23, 1925, the receiver and E. W. Stearns, Deputy Comptroller, met with the directors and named to them the sum of $750,000, for which settlement could be made. On November 27, 1925, the receiver agreed with the directors to forbear suit until February 1, 1926, and toll the statute of limitations until May 21, 1926. On February 1, 1926, the directors notified the receiver that they would agree to the terms of settlement, but the settlement agreement was not signed by all parties until February 22, 1926.

Prior to that time, on December 3, 1925, the receiver was served in an action commenced in the state court by Wegman and others against the receiver and directors to enforce the directors' liability. On February 10, 1926, a bill of complaint was filed in the United States District Court by the receiver against the directors to recover damages on account of the directors' liability. On February 25, 1926, following the signature of the settlement agreement on February 22, 1926, the receiver filed a petition in the United States District Court and obtained an order to show cause, returnable March 16, 1926, why the settlement agreement should not be approved under R. S. § 5234

(12 USCA § 192). After due notice and hearing, Judge Hazel, of the United States District Court, granted the order approving the settlement agreement. On April 4, 1927, an order was entered in the Circuit Court of Appeals, dismissing the appeal taken by shareholders from the order of the District Court approving the settlement agreement.

The plaintiffs in this action ask for an injunction against the receiver and the Comptroller of the Currency, restraining them from carrying out the settlement agreement as approved by order of Judge Hazel, dated February 3, 1926, and from interfering with the action heretofore commenced in the Supreme Court of the state of New York, or settling or compromising any causes of action against the former directors of the National Bank of Commerce by reason of their acts as such directors.

The first question to be decided in this case is: Did the Comptroller of the Currency act fraudulently and in bad faith in appointing a receiver of the National Bank of Commerce on June 21, 1924, and was that action collusive as between the Comptroller of the Currency and the National Bank of Rochester? The second question to be decided in this case is: Was the settlement agreement, made between the Comptroller of the Currency and the receiver of the National Bank of Commerce, on the one part, and the directors of the National Bank of Commerce, on the other part, whereby the directors agreed to pay $750,000 in settlement of the claims of liability made against them for loss and waste of the assets of the bank through their alleged fault, an agreement made in bad faith and in collusion with the directors of the National Bank of Commerce, and in collusion with the National Bank of Rochester, and made for an adequate amount? I shall proceed to the consideration of the first question to be decided.

[1, 2] The language of the statute is: "Whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, * * * appoint a receiver." 12 USCA § 191. In this case the Comptroller, on July 21, 1924, appointed R. L. Curtis receiver of the National Bank of Commerce, reciting in his commission that "from information on file in this bureau I am satisfied that the National Bank of Commerce of Rochester is insolvent and unable to pay its just and legal debts." Prior to that date an examination of the affairs of the bank was made at the instance of the Comptroller. This was not a regular statutory bank ex-

amination, but was made by a national bank examiner in conjunction with the appraisal committee of the Rochester Clearing House Association. In my opinion it fulfills the terms set forth in the language of the statute of "due examination of its affairs." The testimony of the national bank examiner was that as a result of the examination he found the bank to be insolvent.

The plaintiffs raise the question of the actual solvency of the bank on July 21, 1924, the date the receiver was appointed. It is contended that the examination made shortly before that date shows actual solvency, and that the receiver's published statement on that date discloses an excess of assets above liabilities. These statements were made on the basis of the face value of the assets as shown in the books of the bank. The investigation made by the national bank examiner and the committee from the Rochester Clearing House Association into the bank's affairs resulted in their arriving at the conclusion that the bank was insolvent. The subsequent examination of the bank, made by the certified public accountants employed at the instance of the receiver, disclosed that there were losses on bad loans not charged off to May 19, 1924, amounting to $2,476,588.30, and that there were loans classed as worthless in the contract of May 19, 1924, amounting to $1,684,-433.57. The contract of May 19, 1924, also transferred assets enumerated in Schedule B of the face value of $4,001,496.74. These assets were not taken by the National Bank of Rochester at their face value, but were taken in trust to liquidate the same, and apply the proceeds thereof in payment of the debts of the National Bank of Commerce, the surplus, if any, to be paid back to the National Bank of Commerce. It is in this item that the large shrinkage in assets occurred, and when in November the receiver took up the matter of making a settlement with the directors on account of their liability for mismanagement he applied to the National Bank of Rochester for information as to how much this item of assets would yield and the amount of the resulting deficiency. Upon the information he then obtained he made the agreement with the directors to release them from further liability on payment of $750,000. The evidence presented to the receiver was that it would require this sum of money over and above the total of its assets transferred to the National Bank of Rochester to pay the liabilities of the National Bank of Commerce. If the addition of $750,000 to the assets of the National Bank of Commerce was necessary to liquidate its

indebtedness, and its capital stock was even after this payment completely wiped out, it would appear that the National Bank of Commerce was clearly insolvent on the date the receiver was appointed.

Much testimony was given bearing on the question of the validity of the contract of May 19, 1924, by which the National Bank of Commerce transferred all of its assets to the National Bank of Rochester. Counsel for plaintiffs and defendants have discussed this question at length in their briefs. I find that that question is not an issue in this case. Further, it is unnecessary to discuss and decide the question of the authority of the directors to make the contract of May 19, 1924, if the Comptroller was acting within his authority in appointing a receiver of the National Bank of Commerce.

I find that the Comptroller, prior to June 21, 1924, caused an examination of the affairs of the National Bank of Commerce to be made, and had become satisfied of the insolvency of the bank. His action in appointing a receiver for the association was therefore clearly within his authority. Kennedy v. Gibson, 75 U. S. (8 Wall.) 498, 19 L. Ed. 476; Platt v. Beebe, 57 N. Y. 339; Bushnell v. Leland, 164 U. S. 684, 17 S. Ct. 209, 41 L. Ed. 598.

[3] There remains the second question of the bona fides of the agreement between the receiver of the National Bank of Commerce and the directors of the National Bank of Commerce. The settlement agreement between the receiver and the directors of the National Bank of Commerce, signed by all parties on February 22, 1926, provides, briefly as follows:

The directors covenant that they have raised and deposited with the Security Trust Company $750,000, subject to the terms of the agreement. When the receiver shall deposit with the Security Trust Company a certified copy of an order of the District Court approving the settlement agreement, and shall also deposit separate releases of liability of directors, duly executed, and shall deposit a duly executed release by the National Bank of Rochester, the only creditor of the National Bank of Commerce, of all liability to an assessment against the shareholders of the latter and all other claims against them, the Security Trust Company shall pay to the receiver the $750,000: Provided, however, that such payment shall not be made during the pendency of any appeal taken or during the pendency of any collateral suit attacking the settlement agreement. The receiver undertakes to procure the afore-

said release from the National Bank of Rochester and to deposit the same. The National Bank of Rochester is not a party to this agreement.

This agreement was made by the receiver under the direction of the Comptroller of the Currency, pursuant to U. S. Code, § 192, formerly Rev. St. U. S. § 5234. The plaintiffs urge that they are entitled to an injunction restraining the Comptroller and the receiver from carrying out the settlement agreement, and from settling or compromising any causes of action against the former directors of the National Bank of Commerce. They state that the action brought by the receiver against the directors to enforce the directors' liability was brought only after negotiations for the settlement with the directors had been completed. They set forth the failure of the receiver to bring such an action at the request of the stockholders' committee or in co-operation with the stockholders' committee. They urge the inadequacy of the amount of the settlement, which was much less than the amount of the directors' liability as stated in the report of the expert accountants. They urge that the settlement was for an inadequate amount, and was for an amount very much less than it was conceded that the directors were able to pay.

A great deal of preliminary work had to be done before the complaint in an action to enforce the directors' liability could be prepared. Expert accountants were employed, and they did not complete their report for several months. When the report of the expert accountants was finally received and studied, it was found that there were many questions of law bearing upon the directors' liability, which must be considered before the complaint could be prepared. On July 18, 1925, the Comptroller acknowledged receipt of the report of the accountants, and on August 8th following the Comptroller assured the receiver that the report was receiving attention. On August 15 and on August 19, 1925, the attorney for the receiver gave to him an opinion upon the report and the effect of its conclusions. On August 29, 1925, the Comptroller concurred in the opinion of the attorney. On September 11, 1925, upon the resignation of the receiver, a new receiver, Mr. Hulse, was appointed, and the Comptroller urged upon him the desirability of studying the report. The work of drafting the bill of complaint was commenced in October, 1925, and on November 5, 1925, the attorney sent to the receiver a proposed bill of complaint. This was sent to the Comptroller on November 14, 1925.

Shortly after this date, on November 23, 1925, the Comptroller and the receiver met with the directors and discussed settlement. The directors were informed that a bill of complaint was ready and would be filed immediately, unless they agreed to a settlement of $750,000. A few days later the receiver made an agreement with the directors to forbear suit until January 1, 1926, and toll the statute of limitations until May 1, 1926. The bill of complaint in the action against the directors, entitled "Hulse, as Receiver, v. Argetsinger et al.," was filed on February 10, 1926. The negotiations for a settlement had been continued since the meeting of November 23, 1925, with the directors. In furtherance of these negotiations the agreement of November 27, 1925, was made, in which the filing of the complaint was suspended until February 1, 1926. No agreement of settlement had been reached on February 10, 1926, and the testimony is that a settlement under the terms of the agreement was not reached until February 19, and the contract of settlement was not delivered until February 26, 1926.

I am convinced that the receiver directed his attorney to draft the complaint within a reasonably short time after receiving the report of the expert accountants, that the action by the receiver against the directors to enforce the directors' liability was begun as soon as the receiver and his attorney could get together and properly study the material for the preparation of the complaint, and that the action was begun within a reasonable time and without undue delay. The agreement to postpone the filing of the complaint until February 1, in order to assist in bringing about the settlement agreement, was justified, if we assume that the settlement itself was made in good faith and for an adequate amount. This point will now be considered.

The amount of the directors' liability as set forth in the report of the expert accountants was in excess of $3,000,000. The demand for recovery in the action brought by the receiver against the directors was for $3,500,-000. The settlement with the directors was made for $750,000. It is admitted that the ability to pay of all of the directors was in excess of the largest sum above mentioned. Was the receiver justified in making the settlement?

The expert accountants included in their report as a claim against the directors all losses charged off the books since January 1, 1920. In the opinion of the Comptroller and his attorney a large amount of these losses could not be established as against the di-

rectors. The Comptroller was also faced by the defense of the statute of limitations set up by the directors, which his attorney advised him presented serious obstacles to recovery. The action of the Comptroller was further influenced by his conviction that the directors most clearly liable were those who were the least responsible financially, and that the amount of the settlement was for a larger sum than could possibly be recovered by litigation. He states that the experience of his office was that litigation of this character did not bring large results, and that no larger sum had ever been obtained on settlement of claims against directors. The Comptroller refused inspection of the accountants' report to the attorneys for the directors, for fear that an analysis of it by them would imperil the proposed settlement. The attorney for the Comptroller states that the amount demanded in the complaint was for a much greater sum than he had any idea he could establish as a directors' liability, and that he so informed the Comptroller.

Against these statements is the fact that the directors were able, on the basis of their joint financial responsibility, to pay the full amount claimed as a directors' liability in the report of the expert accountants; that at no time was a sum in excess of $750,000 demanded of them; that the action begun by the receiver to enforce the directors' liability was not actually begun until after the negotiations for a settlement were well under way, and it is charged by the plaintiffs that it was not brought in good faith, but only in aid of the settlement.

I have carefully examined the evidence on these points, and I have reached the conclusion that the Comptroller was justified in entering into the settlement agreement with the directors, and that in doing so he was acting in good faith, and not in collusion with the directors of the National Bank of Rochester. I find therefore:

First. That the appointment by the Comptroller of the Currency of a receiver for the National Bank of Rochester was made in good faith and after he had become satisfied of the insolvency of the National Bank of Commerce.

Second. That the acts of the Comptroller of the Currency and the receiver of the National Bank of Commerce of Rochester in making the settlement agreement of February 19, 1926, with the directors, whereby the claims against the directors were compromised for the sum of $750,000, were done in good faith and without collusion.

A decree in accordance with this opinion may be submitted.